FILED'06 MAR 06 17:02 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LINDA BUTEAU,                                              CV-05-3015-TC

        Plaintiff,                                       OPINION AND ORDER

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

---

ARTHUR W. STEVENS III
930 W. 8TH St.
Medford, OR 97501

    Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
District of Oregon
NEIL EVANS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

Page -1- OPINION AND ORDER

JEFFREY BAIRD
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

Attorneys for Defendant

COFFIN, Magistrate Judge:

## BACKGROUND

Plaintiff, Linda Buteau (Buteau), brings this action for judicial review of a final decision of the Commissioner of Social Security denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), and supplemental security income (SSI) under Title XVI of the Act. 42 U.S.C. §§ 401-33, 1381-83f. This court has jurisdiction under 42 U.S.C. § 405(g).

In April and July, 1997, Buteau applied for benefits, alleging disability beginning February 14, 1996, due to fibromyalgia, musculoskeletal complaints and vision loss. After her claim was denied at the administrative level, Buteau brought her case to this court, and on June 27, 2002, the final administrative decision was reversed and remanded pursuant to a stipulated agreement between the parties. In the interim, on April 30, 2001, Buteau filed another application for benefits. It was also denied, and Buteau requested a hearing before an administrative law judge (ALJ). During the pendency of that request, the Appeals Council received the remand order from this court, reinstating the 1997 application as the official claim of record. Thus, Buteau's 2001 claim was incorporated into the record and adjudicated along with the reconsideration of her 1997 claim.

Her date last insured for DIB purposes was March 31, 2000.[1]  She was 40 years old at the time of the ALJ's final decision on January 15, 2005.  She has a high school education and past work as a prep cook, fruit packer, telemarketer and insert stuffer.  She was terminated from her last place of employment in February 1996 due to a personality conflict.

On appeal to this court Buteau claims the ALJ erred by: (1) failing to provide legally sufficient reasons to discredit her testimony; (2) failing to provide legally sufficient reasons to reject examining psychologist Dr. O'Connell's mental residual function capacity report; (3) failing to provide legally sufficient reasons to reject the opinion of Drs. Mersch and Melnyk that she would miss more than three days of work per month; and (4) failing to provide legally sufficient reasons to reject her mother's lay witness testimony.  For the reasons that follow, the Commissioner's decision is AFFIRMED and this case is DISMISSED.

## STANDARD OF REVIEW

The initial burden of proof rests upon the claimant to establish disability.  <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert denied</u>, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected...to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner bears the burden of developing the record.  <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 849 (9th Cir. 1991).

---

[1] Under Title II, a claimant must prove she became disabled prior to the expiration of her insured status in order to be eligible for benefits.

Page -3- OPINION AND ORDER

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001).

## DISABILITY ANALYSIS

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. The claimant bears the burden of proof at steps one through four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999); 20 C.F.R. § 404.1512. Each step is potentially dispositive.

Here, at step one the ALJ found that Buteau had not engaged in substantial gainful activity since her alleged disability onset date. See 20 C.F.R. §§ 404.1520(b), 416.920(b).

At step two the ALJ found that Buteau had the following impairments, considered "severe" within the meaning of the regulations: pain disorder associated with both psychological factors and general medical condition; a personality disorder with dependent passive-aggressive, avoidant and histrionic features; fibromyalgia; lumbar strain-sprain; spondylolisthesis; spondylolysis; degenerative disc disease with foraminal stenosis and nerve impingement; a

Page -4- OPINION AND ORDER

history of obesity; a history of left clawtoe deformity, status post surgical correction; and a right shoulder impingement syndrome, status post decompression. See 20 C.F.R. §§ 404.1520(c); 416.920(c).

At step three the ALJ found Buteau's impairments did not meet or equal the requirements of a listed impairment, codified at 20 C.F.R. Part 404, Subpart P, Appendix 1, considered so severe as to automatically constitute a disability. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

The ALJ determined that Buteau's residual functional capacity (RFC) allowed her to perform work with the following restrictions: lifting 20 pounds occasionally and 10 pounds frequently; the need to change position every hour; only occasionally kneeling, crouching, twisting, bending, and climbing stairs; no crawling; moderate limitations interacting appropriately with the public; moderate limitations maintaining a rapid pace, but still capable of a reasonable pace, and; moderate limitations in independently formulating plans and goals. See 20 C.F.R. §§ 404.1520(e), 416.920(e), 404.1545, 416.945, 404.1567, 416.967.

At step four the ALJ found Buteau could not return to her past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

At step five the ALJ found Buteau could perform other work existing in significant numbers in the national economy, such as leather decorator, parking lot attendant, and marker II. See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Accordingly, the ALJ found Buteau was not disabled.

## DISCUSSION

I.  **The ALJ provided legally sufficient reasons to reject Buteau's subjective complaints.**

Buteau alleges the ALJ wrongly rejected her subjective complaints. She argues that the remand order said to "further consider Plaintiff's subjective complaints" so the ALJ erred by incorporating excerpts from his prior evaluation of Buteau's credibility into this decision. I disagree. In any event, in addition to relying on his previous reasons for finding Buteau unreliable, the ALJ also gave new reasons.

The ALJ is not required to credit every allegation of disabling pain or else disability benefits would be available on demand. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). However, once a claimant establishes the existence of an impairment and a causal relationship between the impairment and some level of symptoms, the ALJ must provide clear and convincing reasons, supported by substantial evidence, for rejecting the claimant's subjective claims. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595 (9th Cir. 1999); see also Thomas v. Barnhart, 278 F. 3d 947, 958-59 (9th Cir. 2002).

In assessing a claimant's credibility, the ALJ may consider: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the objective medical evidence; (5) the location, duration, frequency, and intensity of symptoms; (6) precipitating and aggravating factors; (7) the type, dosage, effectiveness, and side effects of any medication; and (8) treatment other than medication. See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).

Page -6- OPINION AND ORDER

Here, the ALJ provided numerous reasons, supported by substantial evidence, for discounting Buteau's reports. Chief among them was that Buteau, who claimed to be in unremitting, excruciating pain, did not take prescription pain medication, allegedly because no pain medication worked on her pain. In dismissing this contention, the ALJ noted that there are pain medications available for treating very advanced forms of pain, such as "end-stage cancer." In addition, the ALJ found it unlikely that someone who claims to have continuous headaches and constant body pain would not have explored medication alternatives to pain reduction if she were really in as much pain as Buteau claimed to be in. This court also infers that the ALJ found further reason to discount Buteau's claims about the inefficacy of prescription pain medication from her reports that she takes over-the-counter Advil, which would seem to be pointless if prescription pain medication doesn't even work. See Magallanes v. Bowen, 881 F. 2d 747, 755 (9th Cir. 1989)(the court may draw specific and legitimate inferences from the ALJ's decision).

In her brief to this court Buteau states that she tried "Celebrex and other medications but she is allergic to them." However, she points only to her own self reports, and not medical evidence that she is allergic to all pain medications. Thus, I do not find this explanation sufficient to rebut the ALJ's finding that Buteau's refusal of prescription pain medication raises serious doubts about whether she is really in as much pain as she claims. Cf. Social Security Regulation (SSR) 96-7p (ALJ must consider claimant's explanation for failure to pursue medical treatment before drawing inferences about claimant's symptoms).

Another significant reason the ALJ gave for rejecting Buteau's testimony was that the record shows she was less than fully candid about the reason she stopped working, and about her actual diagnoses. Buteau initially alleged that she became disabled by back and hearing

problems beginning February 14, 1996 – her alleged disability onset date. However, her mother reported that she was terminated because of a personality conflict with a co-worker. The ALJ also noted that Buteau reportedly looked for work following her termination, but was not able to find a job that would accommodate her alleged back problems, implying that she believed herself to be capable of working if her back issues could be accommodated. In addition, Buteau told Dr. O'Connell and Dr. Villanueva that she was "born with spina bifida,"[2] but there is absolutely no medical evidence in the record to support this assertion.

  A third reason the ALJ gave for discrediting Buteau was that she has a history of failing to cooperate with disability examiners and demonstrating variable effort upon testing, such that "multiple personality inventory profiles question the reliability of her medical complaints and presentation." Specifically, Dr. O'Connell indicated that Buteau's low scores "call into question this woman's motivation" and "raise significant probability that [she] is exaggerating the severity of her memory difficulties." Due to these validity concerns, Dr. O'Connell concluded that "no usable information was available from the clinical scales." Similarly, Dr. Villanueva stated that Buteau's poor performance on arithmetic testing "may be influenced by limited effort or inability to sustain full focus on the examination" and that empirical evidence shows that "recognition hits of 6 or under is indicative of poor effort...rather than being indicative of memory deficit."

  Buteau argues that her examiner's comments "do not go to the credibility of [her] statements but are additional evidence pointing to the severity of [her] psychological symptoms." However, this court will not substitute its judgment for that of the ALJ if the evidence supports

---

[2] A birth defect (a congenital malformation) in which there is a bony defect in the vertebral column so that part of the spinal cord, which is normally protected within the vertebral column, is exposed.

Page -8- OPINION AND ORDER

the ALJ's conclusion. I find the evidence on this point does support the ALJ's conclusion that Buteau's behavior on testing indicates exaggeration, not a cry for help. See Edlund, 253 F.3d at 1156.

Finally, the ALJ found Buteau's reported activities of daily living were inconsistent with the degree of disability she alleged. A disability claimant will not be penalized for attempting to maintain a sense of normalcy in her life. However, when a claimant's level of activity is inconsistent with her claimed limitations, her activities will have a bearing on her credibility. See Reddick v. Chater, 157 F.3d 715 (9th Cir. 1998). Here, on August 16, 2001, more than four years after her alleged disability onset, Buteau told Dr. Villanueva that she lives in her own apartment, walks about a half a block a day and stretches, prepares breakfast for herself, reads, is trying to write a novel, does bead work and drawing, plays the flute, talks on the phone occasionally with friends, goes grocery shopping when her parents give her a ride, and attends church once a week. While the ALJ also noted that when Buteau initially applied for benefits in 1997 she listed hiking, performance dance, and reading Shakespeare among her activities, even based on her reports from 2001 it was reasonable for the ALJ to conclude that Buteau's activities are inconsistent with the degree of disability and pain she alleges (e.g. continuous pain in her back, hands and feet). Thus, Buteau's argument that the ALJ based this finding on activities she reported one month after allegedly becoming disabled is without merit. Further unavailing is Buteau's contention that "ALJ fails to show that the extent of [her] participation in these activities amounts to substantial gainful activity sufficient to discredit her claim of disability." At step one, the ALJ found Buteau had not engaged in substantial gainful activity since her alleged onset date. In assessing her credibility, the ALJ found Buteau engaged in activities of

daily living – not substantial gainful activity – that was inconsistent with the degree of disability alleged.

For all these reasons, I find the ALJ reasonably determined, based on clear and convincing evidence, that Buteau's testimony was not reliable.

### II. The ALJ provided legally sufficient reasons to discredit the mental residual functional capacity report of Dr. O'Connell.

According to Buteau, the ALJ erred by not adopting the limitations assessed in a check-off worksheet labeled "Mental Residual Function Capacity Report," filled out by examining, non-treating psychologist, Michael F. O'Connell, Ph.D., on October 9, 1998. On this worksheet Dr. O'Connell indicated that he believed Buteau was "markedly limited" in several areas, such as the ability to understand and remember detailed instructions, and "moderately limited" in other areas, such as the ability to remember locations and work-like procedures.

The relative weight afforded the opinion of a physician depends upon his or her opportunity to observe and to get to know the patient as an individual. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). The ALJ must provide "clear and convincing reasons," supported by substantial evidence in the record, for rejecting the opinion of a claimant's physician when it is not contradicted by another doctor, and "specific and legitimate" reasons when it is. See Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600-601 (9th Cir. 1999).

In this case, the ALJ found that the mental functional limitations Dr. O'Connell endorsed on the check-off worksheet were not consistent with his own findings in his accompanying narrative report. The ALJ credited the medical expert, John Crosson, Ph.D., who testified at the hearing. See Roberts v. Shalala, 66 F.3d 184 (9th Cir. 1995)(ALJ may credit the testimony of a nonexamining, nontreating medical expert over an examining, but non-treating physician, with

Page -10- OPINION AND ORDER

specific and legitimate reasons). Dr. Crossen testified that Dr. O'Connell's check-off assessment was unreliable for many reasons, not the least of which was that Dr. O'Connell himself found Buteau's effort on testing was inconsistent, causing him to conclude that "no usable information was available from the clinical scales." Since Dr. O'Connell discredited his own test results, Dr. Crossen stated that it was not clear what clinical evidence Dr. O'Connell used to fill out the check-off assessment. Dr. Crossen also found that the test results obtained by Dr. O'Connell on October 7, 1998, were even lower than the results from pervious tests with no corresponding change in Buteau's medical condition to account for it. In any event, Dr. Crossen said that Buteau's scores "do not represent borderline intellectual functioning as her underlying abilities [which Dr. O'Connell diagnosed]. Her underlying abilities are in the lower end of the average range."[3]

Buteau contends the ALJ rejected Dr. O'Connell's check-off assessment based on his "own speculative inferences on the meaning of Dr. O'Connell's report...". For instance, Buteau argues that the ALJ wrongly concluded that her IQ test results placed her on the upper threshold of the borderline range, closely approaching "low average," because a score of 79 "would seem to be closer to the lower end of borderline." Yet, Dr. O'Connell's "IQ Scores Summary" shows that a score of 79-87 is, indeed, considered "low average." Buteau also argues that Dr. O'Connell didn't caution that his diagnosis was called into question by Buteau's "submaximal effort upon

---

[3] Dr. Crossen went on to opine that Buteau had the following limitations: she would have moderate limitations working with the general public; she could accept supervision sufficient to accomplish routine, fairly repetitive tasks; she would have moderate difficulty maintaining pace, so she should not work in a setting where maintaining a very high productivity level and pace were essential; she would have mild deficits in performing detailed, complicated tasks, and she would have moderate difficulty independently formulating plans and goals.

Page -11- OPINION AND ORDER

testing," as the ALJ found. While this may be true, Dr. O'Connell did state that "no usable information was available from the clinical scales," which included the IQ test upon which his diagnosis of borderline intellectual function was based.

Buteau also argues that the ALJ mischaracterized this comment by Dr. O'Connell regarding the results of personality testing:

> Ms. Buteau had significant elevations on the L scale and the K scale. This pattern on the validity scales suggests that Ms. Buteau made a concerted effort to present herself in an excessively favorable light. As a result, the clinical profile is likely to under represent the degree of psychological difficulty present. Typically, individuals with this kind of response pattern are extremely reluctant to change their perception of themselves.

According to Buteau, from this comment the ALJ concluded that Buteau "made inconsistent effort in an apparent attempt to convince others of her disability." Yet, the ALJ made this comment in response to the totality of Dr. O'Connell's comments, not that specific one.

In addition to the comments previously noted, Dr. O'Connell also stated: (1) Buteau "would stand and suddenly gasp, wince, and spontaneously complain about sudden onset of pain," (2) she responded to many inquiries with the phrase, "you'll have to ask my mother about that"; (3) on a task Buteau perceived to be difficult "she put forth little effort, often responding angrily to the examiner's efforts to encourage her persistence," and (4) Buteau's test results "call into question this woman's motivation, particularly in the area of assessing her memory. While these scores are not likely to indicate conscious malingering, they do raise a significant probability that [she] is exaggerating her memory difficulties. I would speculate that this exaggeration takes the form of an almost reflexive response of "I can't do that" when faced with any kind of task which she perceives to be memory-oriented."

The ALJ credited Dr. O'Connell's observations because he did not state that Buteau's exaggeration amounted to conscious malingering, but an attempt to convince others of her disability, which is also not inconsistent with Dr. O'Connell's comment that Buteau made a concerted effort to present herself in an excessively favorable light.

Finally, Buteau seems to argue that the ALJ also misused Dr. Villanueva's comments in his psychological evaluation to bolster his interpretations of Dr. O'Connell's report. Specifically, Buteau states, "the ALJ concludes that Dr. Villanueva's report supports the ALJ's speculation that [she] is exaggerating, so as to intentionally deceive in her application for benefits," and the "ALJ contended that Dr. Villanueva's narrative report indicated that [her] 'actual functioning' was better than the borderline range I.Q. scores, 'because [she] appeared to put forth submaximal during [sic] the test." Yet, similar to Dr. O'Connell's report, Dr. Villanueva's report contains numerous statements that support the ALJ's findings, as follows: (1) "Rather significant pain behavior was noted during clinical interview...When she stood up the last time to leave the office, she grabbed her low back and made an obvious moaning sound"; (2) "Unfortunately the patient was probably not able to put forth full effort on all aspects of the examination"; (3) on IQ testing "questions regarding effort on [other parts of the test besides verbal and performance IQ] cause some pause in interpretation" but based on the results Buteau's "IQ roughly falls into the low average range"; (4) "test findings are interpreted with a great deal of caution"; (5) "this is an individual who is probably reticent to admit to psychopathology," and; (6) Buteau "may be under-achieving in regards to daily activities and this is of course contraindicated in regards to

dealing with chronic pain."[4]  Additionally, due to Buteau's exam behavior, Dr. Villanueva combined all his diagnoses as "deferred" or "probable," including "probable history of learning disabilities, spelling and arithmetic."  Notably, he did not diagnose borderline intellectual functioning.

In sum, I find the ALJ provided clear and convincing evidence (though only specific and legitimate was required) to support his rejection of the limitations assessed by Dr. O'Connell on a check-off worksheet.

### III. The ALJ provided legally sufficient reasons to reject the opinion of Dr. Mersch and Dr. Melnyk that Buteau would miss more than three day of work per month.

Buteau argues the ALJ erred by not giving clear and convincing reasons for failing to credit indications by Alan Mersch, D.O., and Vera Melnyk, M.D. on a check-off worksheet that she would likely miss more than three days of work per month.  Since I find this assessment was contradicted by other medical opinions in the record, the ALJ only needed to cite specific and legitimate reasons for discrediting it.  See Morgan, 169 F.3d at 600-601.

#### A. Dr. Mersch

First, contrary to Buteau's contention, it was reasonable for the ALJ to credit Dr. Crossen, a psychologist who extensively reviewed the psychological evidence in this case, over Dr. Mersch who is not a psychologist or psychiatrist, with respect to whether Buteau has a somatoform disorder.  Dr. Crossen found that the medical evidence did not support a somatoform

---

[4] Buteau seems to misunderstand this comment as stating that if her pain is real then in that case Dr. Villanueva wouldn't say that she is under-achieving.  "Contraindicated" means "inadvisable."  In other words, a plain reading of Dr. Villanueva's statement would be "if Buteau really has chronic pain restricting her activity is the opposite of what she should to be doing."

Page -14- OPINION AND ORDER

disorder, but rather a pain disorder, because "none of the established mental diagnoses actually caused debilitating psychogenic pain."

Second, the ALJ rejected Dr. Mersch's opinions because they were "mainly conclusory and...objective findings in support of them were minimal." He noted that Dr. Mersch has liberally endorsed disability for Buteau, and many of his statements take the form of inappropriate legal findings reserved to the Commissioner. See 20 CFR §§ 416.960, 416.927(e)(1).

Buteau contends the medical record "includes objective medical basis for [her] pain including MRI results showing multiple diagnosis related to a degenerative disk disease condition in [her] low back." Although she cites only to duplicate copies of a chart note by Dr. Melnyk referencing an MRI, the ALJ nevertheless credited the findings of Douglas Kirkpatrick, M.D., who performed the MRI on March 13, 1997, and found that Buteau had "mild disc degeneration" and "mild spurs" and "existing L-4 root impingement." Yet, unlike Dr. Mersch, Dr. Kirkpatrick did not endorse disability. To the contrary he estimated that Buteau could lift up to 20 pounds and should be able to work a full-time moderately strenuous job. He stated that Buteau did not need surgery, that her long-term prognosis was good, and that she did not need further neurological testing.

Third, the ALJ found insufficient psychological evidence to support Dr. Mersch's psychological diagnoses of general anxiety disorder, obsessive compulsive disorder, and audio-in dyslexia, notwithstanding the fact these diagnoses were out of Dr. Mersch's field of expertise. Notably, Buteau offers no rebuttal to this finding.

In sum, I find specific and legitimate reasons in the ALJ's opinion to reject Dr. Mersch's opinion.

### B.    Dr. Melnyk

On a worksheet similar to the one counsel provided Dr. Mersch, Vera Melnyk, M.D., also checked off that Buteau would miss more than three days of work per month. Dr. Melnyk diagnosed Buteau with fibromyalgia on November 18, 1997. Yet, on a follow-up visit less than one year later (July 28, 1998), Dr. Melnyk found the trigger points used to test for fibromyalgia were negative. The ALJ concluded that together with the minimal treatment Dr. Melnyk endorsed, these findings case doubt on the diagnosis, and therefore on Dr. Melnyk's asessment of Buteau's abilities. Particularly in light of the record indicating Buteau's subjective reports are not credible, I find this to be a specific and legitimate reason to discredit Dr. Melnyk's opinion.

### IV.    The ALJ provided legally sufficient reasons to discredit Buteau's mother's lay witness testimony.

Buteau claims the ALJ wrongly rejected her mother's testimony that she believes Buteau is getting worse because she has many angry outbursts, and that she has an impairment called "audio dyslexia."

The ALJ is required to account for lay witness testimony, and if he rejects it, to provide germane reasons for doing so. See <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001). However, the ALJ is not required to discuss non-probative evidence. See <u>Vincent ex. rel. Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

Here, the ALJ found Buteau's mother to be less than entirely persuasive because, as Dr. Villanueva opined, the mother appeared inclined to excessively pamper Buteau far beyond what her medical condition required such that "the two might have developed mutual co-dependency."

Page -16- OPINION AND ORDER

In addition, the ALJ found Buteau's mother's opinion was inconsistent with Dr. Crossen's assessment of Buteau's work related psychological functional limitations. Dr. Crossen also stated that there is no such thing as "audio dyslexia."

I find these to be germane reasons to reject lay witness testimony.

## CONCLUSION

Based on the foregoing, the Commissioner's final decision is AFFIRMED, and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 6th day of March, 2006.

Thomas Coffin
United States Magistrate Judge